No. 03-263

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 126N

ROGER PETERS,

       Plaintiff and Respondent,

   v.

GERALD BURK, RUSSELL DUPUIS, and
KIRBY ALTON,

       Defendants and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
                In and For the County of Beaverhead, Cause No. DV-01-12392
                Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Allan H. Baris; Moore, O'Connell & Refling, Bozeman, Montana
              (for Kirby Alton)

       For Respondent:

              Ronald F. Waterman; Gough, Shanahan, Johnson & Waterman,
              Helena, Montana

                    Submitted on Briefs:  October 30, 2003

                             Decided:  May 17, 2005

Filed:

                              Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1　Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent. It shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2　Kirby Alton appeals from the Order and Judgment entered by the Fifth Judicial District Court, Beaverhead County, awarding summary judgment in favor of Roger Peters. We affirm.

¶3　The restated issue on appeal is whether the District Court erred in granting summary judgment to Peters.

## BACKGROUND

¶4　In 1976, six ranchers formed the Alaska Basin Grazing Association (ABGA) to acquire and maintain real property for livestock grazing. Despite its nonprofit status and bylaw providing for membership certificates, the ABGA issued shares. It obtained loans from the federal government entity now known as the Farm Service Agency (FSA), which were subject to FSA regulation.

¶5　In 1998, the ABGA amended its bylaws to reduce the minimum number of members to three, and Peters purchased 48% of the shares. Gerald Burk and Russell Dupuis held the remaining 52% of the shares. In 2000, Alton's attorney asked Burk and Dupuis if they

would sell their shares to Alton.  In a subsequent letter to Alton's attorney, the FSA stated it would not consent to reducing the ABGA to two members--which was the effect of Alton's planned purchase--because doing so "would remove two 'small farmers/ranchers' and the original purpose of the loan would no longer exist."  However, the FSA stated it would consider assigning its note and relevant documents upon the ABGA's written request.  It is undisputed that the purpose of this contemplated FSA assignment was to remove the ABGA's loans from FSA regulation.

¶6      On October 5, 2000, Burk and Dupuis signed letters memorializing "broad outlines" of their agreements with Alton to sell their shares and obtain the ABGA's approval of: (1) Alton's membership and the share transfer to him, (2) the adoption of revised bylaws, and (3) a written request for the FSA assignment.  The October 5 letters provided that, "[o]nce the approvals outlined above have been obtained" and the FSA assignment occurred, Alton would pay Burk and Dupuis for their shares.

¶7      At a meeting of the ABGA members on October 6, the ABGA approved the written request for the FSA assignment.  It also approved the share transfer and bylaw revisions, noting that both were "contingent and effective upon" the FSA assignment.  Each motion for approval passed on a 2 to 1 vote, with Peters opposing.

¶8      A certificate signed by the ABGA's secretary establishes the ABGA adopted its revised bylaws on December 13, 2000.  On the same date, the FSA assigned the note, mortgage and shared appreciation agreement to a finance company owned by Alton.  As the parties subsequently agreed, the physical transfer of shares to Alton also occurred on

3

December 13.

¶9     Peters sued Burk, Dupuis and Alton, alleging the share transfer to Alton violated a provision in the revised bylaws, which affords existing members of the ABGA a right of first refusal "[i]n the event that any member receives a bona fide offer to purchase any or all of his shares of stock[.]"  Alton moved for summary judgment, arguing the right of first refusal in the revised bylaws did not apply to his acquisition of Burk's and Dupuis' shares.  The District Court held a hearing at which counsel stipulated that Peters was not seeking damages, the only issue was whether Peters had a right of first refusal applicable to Alton's purchase of shares and summary judgment in Peters' favor would be appropriate if the court interpreted the documents in the manner Peters advanced.  The issue of interpreting the documents essentially boiled down to which party's sequence of effectiveness of the various events, or lack thereof, the District Court accepted.

¶10     Noting the virtual dearth of legal authority on the precise issue before it, the District Court denied Alton's motion.  It reasoned that "if the right of first refusal became effective before Alton became a member, Burk and Dupuis would be required to allow Peters (not Alton) the first opportunity to purchase."  The court also determined the revised bylaws took effect before Alton became a member and acquired shares, because he was not eligible for membership under the 1998 bylaws.  The court did not grant Peters summary judgment, however, because it determined the date of the share transfer remained a genuine issue of material fact.  Peters later moved for summary judgment and, after a second hearing, the District Court granted Peters' motion based on the parties' agreement that the share transfer

4

occurred on December 13, 2000.

¶11    Alton appeals.  Burk and Dupuis are not parties to this appeal.  We set forth additional facts as necessary in the discussion below.

## STANDARD OF REVIEW

¶12    We review *de novo* a district court's grant of summary judgment under Rule 56(c), M.R.Civ.P., to determine whether a genuine issue of material fact exists and whether the district court correctly concluded the moving party is entitled to judgment as a matter of law. *See Bartlett v. Allstate Ins. Co.* (1996), 280 Mont. 63, 68, 929 P.2d 227, 230 (citations omitted).

## DISCUSSION

¶13    *Did the District Court err in granting Peters summary judgment?*

¶14    Alton first contends the FSA assignment was a condition precedent to both the bylaw revisions--including the right of first refusal--and the share transfer.  He is correct.

¶15    A condition precedent is "one which is to be performed before some right dependent thereon accrues or some act dependent thereon is performed."  Section 28-1-403, MCA.  The minutes of the October 6 meeting reflect that both the bylaw revisions and share transfer were "contingent and effective upon"--that is, dependent on--the FSA assignment.  The October 5 letters also provided the share transfer would occur "[o]nce" the FSA assignment took place.  Therefore, we conclude the FSA assignment, which occurred on December 13, was a condition precedent to the bylaw revisions and share transfer.

¶16    From this premise, Alton asserts the share transfer could have occurred before or at

5

the same time as the bylaw revisions. In support, he advances § 28-3-601, MCA, which provides, in part, that "[i]f the act [required to be performed] is in its nature capable of being done instantly (for example, if it consists in the payment of money only), it must be performed immediately upon the thing to be done being exactly ascertained." As stated above, the ABGA's 1998 bylaws set the minimum number of members at three. Thus, the share transfer could not occur "instantly" after the FSA assignment, but before the bylaw revisions, because the share transfer would have reduced the ABGA's membership to two--in violation of the three-member minimum required by the 1998 bylaws. Moreover, Alton's assertion that the share transfer occurred at precisely the same time as the bylaw revisions contradicts his position in the District Court, where he asserted in a brief and affidavit that the share purchase was "contingent upon" the bylaw revisions due to the "major hurdle" and "major obstacle" presented by the three-member minimum. In other words, the bylaw revisions necessarily preceded the share transfer. We conclude the purported share transfer did not occur before or at the same time as the bylaw revisions.

¶17 For these reasons, we conclude the FSA assignment was a condition precedent to both the bylaw revisions and the anticipated share transfer, and the adoption of the revised bylaws also was a condition precedent to the purported share transfer. Consequently, on December 13, the FSA assignment occurred first, the bylaw revisions--including the right of first refusal--occurred second, and the purported share transfer occurred thereafter. Stated differently, the right of first refusal took effect prior to the  share transfer.

¶18 Alton asserts, however, that regardless of when the purported share transfer took place

6

in relation to the bylaw revisions, the 1998 bylaws were in effect on October 5, the date of the "original agreement" to sell the shares. He advances *Hall v. Tennessee Dressed Beef Co.* (Tenn. 1997), 957 S.W.2d 536, for the proposition that the applicability of a bylaw revision affecting a right of first refusal "depends on the date of the original agreement to sell the shares, not the date of closing." Peters also relies on *Hall* in support of his position.

¶19    *Hall* involved, in part, a direct claim by William Hall against Tennessee Dressed Beef Co. (TDB) for breach of a corporate bylaw. William, Richard Hall and two other people-- the McRedmonds–owned all of TDB's shares. The bylaw provided that if a shareholder wished to sell shares to a non-shareholder, he or she was required to notify the corporation and the other shareholders would have twenty days to exercise a right of first refusal. Richard executed a stock purchase and corporate redemption agreement with the McRedmonds, which was not disclosed to William, that he would purchase some of their shares and the corporation would redeem their remaining shares. Before the share purchase and corporate redemption transaction closed, a shareholder meeting occurred at which Richard voted his own shares and the McRedmonds' shares, by proxy, to repeal the right of first refusal in the bylaws. At a later meeting, Richard disclosed the purchase agreement and a newly elected board ratified it. *Hall*, 957 S.W.2d at 538-39.

¶20    William sued, alleging--among other things--that the repealed bylaw provision obligated TDB to notify him of the contemplated corporate redemption because it constituted a sale to the corporation itself, a non-shareholder. Richard and TDB argued that William did not actually have a right of first refusal applicable to the McRedmonds' shares because the

7

bylaw was repealed before the transaction closed. The Tennessee Supreme Court interpreted the bylaw as obligating TDB to notify other shareholders of proposed sales in order to afford them the opportunity to exercise their right of first refusal. It also concluded that--whether or not the repeal was valid--the bylaw provision was in effect when the agreement was executed. Thus, it concluded TDB was obligated to notify William of the McRedmonds' intent to have the corporation redeem some of their shares. *Hall*, 957 S.W.2d at 539-40. *Hall* is not persuasive authority for Alton's position here.

¶21 It is true that *Hall*, like the present case, involved efforts to manipulate events to the disadvantage of the minority shareholder. However, *Hall* did not involve an action by an "external" entity, like the FSA here, which was a condition precedent to all other events. In addition, the stock purchase and redemption agreement in *Hall*, between Richard and the McRedmonds, differed significantly from the letters signed by Burk and Dupuis in the present case, as discussed more fully below. Finally, as discussed above, the anticipated share transfer here was expressly contingent on the bylaw revisions--which included the right of first refusal. For these reasons, *Hall* is not applicable to the case before us.

¶22 Next, Alton argues that, even if the revised bylaws became effective before the purported share transfer, the right of first refusal is unambiguous in its inapplicability to the transaction contemplated in the October 5 letters. The right of first refusal, as set forth in Article II, Section 9, of the ABGA's revised bylaws, provides that

> [i]n the event that any member receives a bona fide offer to purchase any or all of his shares of stock in the Association, he shall first notify the Association of the terms of the offer, and the existing members shall have the opportunity to purchase such shares upon the same terms and conditions as

specified in such offer.

Alton first argues this provision, by its terms, applies only to "offers," while the October 5 letters are executory agreements because they reflect Burk and Dupuis' acceptance.

¶23    "A right of first refusal does not give the rightholder the power to compel an unwilling owner to sell, but merely requires the owner, when and if he decides to sell, to offer the property first to the rightholder at the stipulated price." *Kennedy v. Dawson*, 1999 MT 265, ¶ 41, 296 Mont. 430, ¶ 41, 989 P.2d 390, ¶ 41 (citation omitted).  In other words, a right of first refusal is only triggered if the owner has manifested an intent to sell upon certain terms--that is, decided to sell at a stated price.  Otherwise, a right of first refusal would require an owner to afford the rightholder the opportunity to match an offer even if the owner did not wish to sell.  We conclude that the right of first refusal in the ABGA's revised bylaws applies to Burk's and Dupuis' decision to sell their shares to Peters for a total of $650,000.

¶24    Alton also asserts, however, that the right of first refusal applies only prospectively-- that is, to offers received after the revised bylaws became effective on December 13 and not to the offers referenced in the October 5 letters.  He contends the October 5 letters "took effect (subject to certain contingencies) October 5, 2000, when the letter agreements were signed by Burk and Dupuis."  In support, he advances § 28-2-906, MCA, which provides that a written contract takes effect upon delivery to the party in whose favor it is made or the party's agent.

¶25    We first note that the status of the October 5 letters as "written contracts" is

9

questionable. First, Alton's attorney--not Alton himself--signed the letters to Burk and Dupuis, who then signed the attorney's letters "outlin[ing] the general terms of [their] agreement with Dr. Alton." Moreover, the letters left open whether Alton would pay in cash or over time, did not specify the terms of payment and contemplated a future "formal written contract." In light of the fact that Alton did not sign the letter agreements, which themselves contemplated a subsequent formal contract, we are not persuaded that § 28-2-906, MCA, rendered the letter agreements effective on October 5.

¶26 Alton also relies on § 28-3-203, MCA, for the proposition that "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction are to be taken together." He asserts the October 5 "contracts" and "other written instruments"--including the revised bylaws and minutes of the October 6 meeting--must be read together, and that doing so supports his position that the right of first refusal did not apply to the share transfer at issue here. The minutes of the October 6 meeting are not a "contract," however, but merely a record of the ABGA's members meeting reflecting Burk and Dupuis' performance in relation to the October 5 letters. Moreover, the parties to the writings differ. Peters, Burk, Dupuis and the ABGA itself --but not Alton--are indisputably parties to the revised bylaws. Moreover, only Burk and Dupuis signed the October 5 letters. Thus, we conclude § 28-3-203, MCA, does not apply here.

¶27 Alton also relies on "[e]lementary logic" and a list of possibilities that could result from "retroactive" application of the bylaw provision. These conclusory and speculative statements do not constitute authorities for his argument, as required by Rule 23(a)(4),

10

M.R.App.P.  Alton also lists cases, purporting to demonstrate that rights of first refusal are generally exercised at the beginning of a transaction.  This general contention does not assist in our analysis of the unique circumstances of this case.  We conclude Alton has not adequately supported his argument that the right of first refusal does not apply to the transfer of shares at issue here.

¶28  A provision is ambiguous only if it is reasonably subject to two different interpretations.  *See In re Marriage of Mease*, 2004 MT 59, ¶ 30, 320 Mont. 229, ¶ 30, 92 P.3d 1148, ¶ 30 (citation omitted).  Given our conclusions above, we further conclude the only reasonable interpretation is that the right of first refusal applied to the anticipated share transfer and, as a result, the revised bylaw provision is unambiguous.  Consequently, we need not address Alton's additional arguments relating to ambiguity.

¶29  Finally, Alton challenges two additional matters in the court's order.  First, he asserts the District Court erred in concluding that Alton was not eligible to become a member under the 1998 bylaws.  We observe that the "not eligible for membership" clause must be read in the context of the discussion to which it pertains; namely that until the FSA assignment and the effectiveness of the revised bylaws, Alton could not become a member because of the 3-member minimum in the 1998 bylaws.  In this context, the District Court's overall conclusion was correct notwithstanding that its use of the more technical term "not eligible" may have been misleading.  In any event, the District Court's reasoning regarding Alton's eligibility for membership is irrelevant to our conclusion that the three-member minimum in the 1998 bylaws precluded the share transfer.  Alton also contends that the court erred in

11

stating that allowing Alton to avoid the right of first refusal "seems unfair."  While we agree

that "fairness" was not the issue, the statement is entirely irrelevant to that court's, and our,

conclusions that the revised bylaws became effective before the purported share transfer and

the right of first refusal unambiguously applies to Alton's acquisition of shares.

¶30    We hold the District Court did not err in granting summary judgment to Peters.

¶31    Affirmed.


                              /S/ KARLA M. GRAY


We concur:

/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER